**In re FURR'S SUPERMARKETS, INC., Debtor.**

**Yvette Gonzales, Trustee, Plaintiff,**

**v.**

**Food Marketing Group, Defendant.**

Bankruptcy No. 7–01–10779 SA.
Adversary No. 02–1173 S.

United States Bankruptcy Court,
D. New Mexico.

Oct. 15, 2004.

Chris W. Pierce, Albuquerque, NM, for Plaintiff.

### MEMORANDUM IN SUPPORT OF ORDER GRANTING IN PART AND DENYING IN PART TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT FOOD MARKETING GROUP'S CROSS–MOTION FOR SUMMARY JUDGMENT

JAMES S. STARZYNSKI, Chief Judge.

These dueling motions for summary judgment raise, among other issues, the question of whether a chapter 11 debtor in possession's postpetition overpayment for goods to a creditor vendor can be offset by the creditor's administrative reclamation claim. The Court finds that, at least where as in this case it is likely that the estate is administratively insolvent, no offset may be allowed. The Court also denies the creditor's recoupment defense against the Trustee's prepetition preference claim and the Trustee's postpetition claim for overpayment.

On February 8, 2001, Furr's Supermarkets, Inc. ("Furrs")[1] filed a chapter 11 case and operated as a debtor in possession until December 19, 2001, when it converted to a chapter 7 case and Ms. Gonzales was appointed as the case trustee ("Trustee"). The Trustee filed a First Amended Complaint (doc 18) pursuant to § 542[2] which sought from Food Marketing Group ("FMG") (1) the recovery of prepetition preferential transfers in the amount of $366,125.31 (increased to $370,967.17 in the motion for summary judgment) after deduction of subsequent new value, and (2)

the recovery of $46,936.19 (reduced to $26,737.35 in the motion for summary judgment) in postpetition overpayments to FMG. FMG filed a Second Amended Answer (doc 28) which mostly denied the allegations of the complaint and raised, as to the preferential transfer claim, the affirmative defenses of contemporaneous exchange for new value, ordinary course of business, and subsequent new value (subsections 547(c)(1), (c)(2) and (c)(4) respectively), and also asserted an affirmative defense of recoupment as to the prepetition and postpetition transactions and setoff as to the postpetition transactions.

The Trustee has moved for summary judgment (doc 37—corrected image doc 53) for the prepetition and postpetition sums, including asking for judgment on the affirmative defenses. FMG has cross moved for summary judgment on the affirmative defenses, doc 40, and filed a brief in support of its cross motion for summary judgment and opposing the Trustee's motion for summary judgment. Doc 42. The Trustee has responded and replied (docs 45 and 46 respectively) and FMG has replied (doc 49).

Having considered the pleadings, motions, affidavits and other evidentiary materials submitted by the parties, the Court will grant the Trustee judgment in the amount of $370,967.17 for the prepetition transfer and will overrule the defenses raised by FMG to the prepetition liability except for the ordinary course of business defense. That one defense will be reserved for trial. The Court will also grant judgment to the Trustee for $26,737.35,

---

1. The founder of the chain was Roy Furr. At some point, long after Mr. Furr's death, the chain began to drop the apostrophe from its name.

2. Unless otherwise indicated, all chapter and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and to the Federal Rules of Bankruptcy Procedure, Rule 1001–9036.

representing the amount of postpetition overpayments to FMG by Furrs during the chapter 11 phase of the case (what the parties have termed the "Account Balance"), but will not allow FMG to net out the Account Balance against the larger sum of $76,307.15 (*see* Scott Affidavit, doc. 43, ¶ 33) that the estate owes to FMG on a § 546(c) reclamation claim. The issue of prejudgment interest, not addressed by the motions, will also be reserved for trial.

## ANALYSIS

### Summary Judgment Standards

The Bankruptcy Code provides for summary judgment through the Federal Rule of Bankruptcy Procedure 7056, which adopts the Federal Rule of Civil Procedure 56. Pursuant to Rule 56(c), the court should grant summary judgment when after consideration of the record it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis deleted).

The party moving for summary judgment has the burden of establishing that summary judgment is appropriate. *Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793, 793 (10th Cir.1995). However, once the moving party has supported its motion, then it is incumbent upon the adverse party to show that there are material facts in dispute. Fed.R.Civ.P. 56(e). The adverse party may not rely solely on its pleadings but must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

### Trustee's § 547(b) Prima Facie Case

The Trustee's motion, including particularly the Kefauver affidavit, make clear that Furrs made payments to FMG in the amount of $370,967.17 within the ninety-day preference period. Even though FMG's second amended answer to the first amended complaint denied the various elements that make up a preferential transfer,[3] FMG's responding brief (doc 42) and the supporting affidavits, particularly those from Messrs Lipovich and Bullock, do not really dispute that those transfers took place. Pursuant to Rule 56(e), a simple denial is not enough to show that an issue is controverted. Once a fact issue has been established by the moving party, the adverse party must go beyond the pleadings to show that it is controverted. Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Trustee made the requisite factual showing on the elements for her § 547(b) case, and FMG failed to controvert that showing.

---

3. Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
  (A) on or within 90 days before the date of the filing of the petition; or

  (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
  (A) the case were a case under chapter 7 of this title;
  (B) the transfer had not been made; and
  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The parties do dispute whether there was an "agreement" between them, and what that agreement was. FMG, a vendor of food products known in the industry as a "diverter"[4], insists that the parties agreed that when Furrs purchased products from FMG, it would pay for them within thirty days after delivery, a time period that was standard in the industry for diverters. Furrs argues that there was no continuing agreement and that in any event payments to FMG were outside the industry standard of payment on delivery or within a day of delivery. These arguments go to the ordinary course of business defense, but not to the issue of whether the transfers were made. Thus, there is no factual question that the transfers took place. The trustee is entitled to judgment on her § 547(b) complaint.

### FMG's Ordinary Course of Business Defense

Given that FMG bears the burden of proof on the § 547(c) issues, § 547(g), it follows that once the Trustee has established a prima facie § 547(b) case, FMG bears the burden of showing that there is no material issues of fact as to each of the three elements of the ordinary course of business defense and that it is entitled to judgment on that defense. *See Gonzales v. DPI Food Products Co. (In re Furrs*

*Supermarkets, Inc.)*, 296 B.R. 33, 40 (Bankr.D.N.M.2003)(Failure of creditor to meet any of the three requirements of § 547(c)(2) results in denial of the defense.) (*Citing Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir. 1993) *cert. denied* 512 U.S. 1206, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994)).

Section 547(c)(2)[5] defines the three elements of the defense, including the third element that the transfer was made according to ordinary business terms. The Trustee argues that diverters ordinarily insist on immediate cash payments—in effect, payment on delivery or within no more than one day of delivery—relying in large part on what seems to be clear and lengthy testimony from the deposition of FMG's expert Richard Bullock, Exhibit J to the Motion for Summary Judgment (doc 37/53), and on the affidavit of Colleen Johnson. Exhibit M to Trustee's Response to Cross–Motion for Summary Judgment (doc 45). FMG argues that ordinary business terms include extending credit up to as much as thirty days after delivery, submitting in support thereof affidavits of Messrs Eder and Lipovich as well as of Mr. Bullock, who asserts in his affidavit that he was quoted from his deposition out of context.[6] Given the op-

---

4. A diverter is an alternative supplier of product to retailers. A diverter buys products from the manufacturer or from retailers, either of whom may have excess product, at a discount or in a region where the products are more plentiful and then resells the products to its purchaser. The purchaser is able to obtain the product from the diverter when it would otherwise not be able to obtain it at all, or for less than the retailer would be able to obtain the product from the manufacturer. Deposition of Richard Bullock, page 12, line 17 through page 14 line 21.

5. Section 547(c)(2) provides:
   The trustee may not avoid under this section a transfer—

. . .
   (2) to the extent such transfer was—
   (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
   (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
   (C) made according to ordinary business terms.

6. The Bullock affidavit is Exhibit H to FMG's memorandum in opposition to Plaintiff's motion for summary judgment and in support of cross motion for summary judgment (doc 42); the Eder affidavit is Exhibit G, and the Lipo-

posing affidavits, and even though the Court is skeptical of Mr. Bullock's "clarifying" affidavit, no summary judgment can issue for Plaintiff on the § 547(c)(2)(C) defense.

### Other Affirmative Defenses to the Prepetition Transfers

■ FMG has not argued the contemporaneous exchange of new value and subsequent new value defenses (§ 547(c)(1) and (c)(4)), presumably recognizing the inapplicability of the first defense to these facts and acknowledging the Trustee's application of the second defense in her initial accounting for what is owed. Nor has FMG strongly argued that the doctrine of recoupment applies to allow it to net out against the prepetition transfer balance the amounts it is owed postpetition on its reclamation claim. (It has raised this argument only fleetingly, and then only as part of its defense to the Trustee's recovery of postpetition overpayments.) Such a defense would be unavailing in any event, for two reasons.

■ First, § 547(c) is the exclusive list of defenses available to preferential transfers. See In re Milwaukee Cheese Wisconsin, Inc., 112 F.3d 845, 848 (7th Cir. 1997) (" '[A] bankruptcy court is a court of equity' is not a mantra that makes the Bankruptcy Code dissolve."). Section 547(c) makes no mention of recoupment, so it cannot serve as a defense. The fact that various courts have applied the recoupment doctrine to allow or require that a debtor's postpetition payments be applied to a debtor's prepetition debts does not justify extension of that doctrine to preference law.[7]

■ Second, for the recoupment doctrine to apply, FMG must demonstrate the existence of an agreement between it and Furrs such that the transactions at issue that gave rise to the competing claims were so closely related that the one claim was "essentially a defense" to the other claim. Ashland Petroleum Company v. Appel (In re B & L Oil Company), 782 F.2d 155, 157 (10th Cir.1986). But even if there was an agreement between Furrs and FMG, it was only to have Furrs pay at a certain time for whatever product it purchased. There was no obligation as such to buy or sell, or for FMG to supply product or for Furrs to look to FMG for product. Compare, for example, the following cases cited in B & L Oil, 782 F.2d at 157; Waldschmidt v. CBS, Inc. (In re Waldschmidt), 14 B.R. 309, 314 (M.D.Tenn.1981) (advance royalties to a musician on recording contract could be recouped from postpetition record sales); In re Midwest Service and Supply Co., 44 B.R. 262, 265 (D.Utah 1983) (overpayment of progress payments prepetition could be recouped when contract performance continued postpetition); and In re Yonkers Hamilton Sanitarium, Inc., 22 B.R. 427, 433 (Bankr.S.D.N.Y.1982), aff'd 34 B.R. 385 (S.D.N.Y.1983) (prepetition Medicare overpayments could be recouped from postpetition payments to estate which continued to operate under the contract). So in reality the parties' arrangement was little different than a customer purchasing an item from K–Mart, or ordering an item from Lands End and paying when it arrives. It is not enough merely that the claims at issue arise out of the same con-

---

vich affidavit is Exhibit I. All the affidavits say that terms up to 30 days are normal. (The Bullock affidavit says it has his expert report annexed as Exhibit 1; it is not annexed but that does not make a difference.)

7. Whether the doctrine of recoupment should even be recognized in bankruptcy cases is itself questionable. See below at pages 12–18.

tract; something more must be shown. *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.),* 82 F.3d 956, 960–61 (10th Cir.1996). As is elaborated in more detail below, FMG has made no such showing. Thus its recoupment defense to the Trustee's prepetition preference claim must be denied.

### Trustee's Claim to Recover Postpetition Overpayments

The parties do not dispute that after the filing of the petition, Furrs and FMG continued to deal with each other, resulting in an overpayment by Furrs of $26,737.35. Thus, the Court finds that FMG owes the estate the $26,737.35, subject to any netting out that may be applicable.

### FMG's Defenses of Recoupment and Set-off to Postpetition Overpayments

FMG states and the Trustee does not dispute that FMG has a reclamation claim against the estate for $76,317.15 representing the value of products that were shipped to Furrs on credit prior to the filing of the petition but which were not returned by Furrs despite demand therefor by FMG pursuant to a nonbankruptcy right of reclamation. *See* § 546(c). Furrs did not return the goods, nor did the Court grant FMG a lien to secure repayment of the amount owed. In consequence, FMG now has a claim against the estate of the same priority as a § 503(b) administrative claim. § 546(c)(2)(A).[8] Because the reclamation occurred during the chapter 11

phase of the case, the resulting claim has the status of a chapter 11 administrative claim. Chapter 11 administrative claims are inferior to chapter 7 administrative expenses. § 726(b). The Account Balance—the $26,737.35 owed by FMG to the estate—is also a chapter 11 obligation. Thus FMG seeks to net out the two claims using either recoupment or setoff. For the reasons set out below, the Court declines to permit that netting out under either theory.

### Recoupment

█ "[A] creditor properly invoking the recoupment doctrine can receive preferred treatment even though setoff would not be permitted. A stated justification for this is that when the creditor's claim arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable."

*In re B & L Oil Company,* 782 F.2d at 157. (Citations and internal quotation marks omitted.) *See also Davidovich v. Welton (In re Davidovich),* 901 F.2d 1533 (10th Cir.1990); *In re Peterson Distributing, Inc.,* 82 F.3d 956.

In *B & L Oil,* pursuant to a division order, Ashland paid, indeed mistakenly overpaid, B & L for two deliveries of oil, after which B & L filed a chapter 11 petition. Ashland then continued to take

---

8. Trustee asserts that FMG's reclamation claim "is essentially a pre-petition claim". Trustee's motion for summary judgment, at 21. Doc 37/53. The Trustee does not submit any authority for her position. The claim arises from prepetition deliveries not paid for but (postpetition) not returned to FMG. The Court assumes without deciding that the reclamation claim is entitled to postpetition administrative treatment given what seems to be the clear language of § 546(c)(2)(A) ("... if

the court ... grants the claim of such seller priority as a claim of a kind specified in section 503(b) of this title...."). The Court finds that for purposes of these motions for summary judgment it is not necessary to decide this issue because the Court has determined that the postpetition claims may not be netted out, nor may FMG's postpetition claims be netted out against the Trustee's preference claim.

deliveries of oil from B & L until it had recouped postpetition most of the overpayments but refused to pay for the deliveries. The Tenth Circuit noted that the "cleavage in time" effected by the filing of the petition precluded setoff of the two debts. 782 F.2d at 158. But the court did allow Ashland to net out the claims by recoupment. *Id.* at 157. The court explained that recoupment could be invoked in the bankruptcy context when the transactions at issue that gave rise to the competing claims were so closely related that the one claim was "essentially a defense" to the other claim. *Id.* In consequence the Code's narrow limitations on netting out claims as expressed in § 553 (prepetition setoff) could be avoided. *Id.* However, the court also stated that, on the facts before it, Ashland's overpayment was not "essentially a defense" to the postpetition claim against Ashland but was analogous to cases in which recoupment had been applied. *Id.* at 158–59. The court then held that Ashland could still net out the claims because the relationship was similar to an executory contract and the estate should not be able to obtain the benefit of the

contract without also carrying the burdens, and that what had happened was a "classic case of unjust enrichment".[9] *Id.* at 159. *See also United States v. Midwest Service and Supply Co., Inc. (In re Midwest Service and Supply Co., Inc.),* 44 B.R. 262, 265–66 (D.Utah 1983) (Debtor in possession postpetition continued to perform under the contracts with the government, thereby effectively assuming the contract, which justified the use of the recoupment doctrine).[10]

In *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.),* 82 F.3d 956 (10th Cir. 1996), Peterson had incurred approximately $245,000 of prepetition debt to Conoco for product delivered but not paid for. Peterson had also delivered to Conoco approximately $69,000 of Conoco credit card invoices, pursuant to an agreement whereby Conoco would accept qualifying credit card invoices and then debit Peterson's checking account in the amount of the qualifying invoices. However, only about $23,000 of the credit card invoices were eligible to be used as payment before Peterson filed its chapter 11 petition; the

9. *B & L Oil* is an oddity among bankruptcy cases for several reasons. One is that the "unjust enrichment" which triggered the special creditor treatment in this case did not result from any misbehavior, much less fraud, on the part of the debtor. Nothing in the facts recited in the case suggests that the overpayment to the debtor was due to anything more than the creditor's negligence, a not unusual occurrence between creditors and debtors engaged in commerce with each other. What was unusual was the court's response to the creditor's problem. Relying on an equitable doctrine derived from a long antiquated pleading system, 782 F.2d at 157, *see In re Davidovich,* 901 F.2d at 1537, the court overrode both the "cleavage in time" distinction which permeates the Bankruptcy Code and bankruptcy practice, *B & L Oil,* 782 F.2d at 158, and "the basic bankruptcy principle of equal distribution to creditors", *In re Peterson Distributing, Inc.,* 82 F.3d at 959, in order to permit the creditor to net out its

unsecured prepetition claim against a deliberately incurred postpetition obligation to the estate. And by allowing the netting out, the court also deprived the estate of some of its postpetition cash flow, ordinarily the lifeblood of a newborn chapter 11 estate. Finally, the decision essentially allowed the creditor the benefit of the estate assuming the contract without the estate having elected § 365 treatment of the contract. 782 F.2d at 159. The *B & L Oil* court suggested that the recoupment doctrine "perhaps should be narrowly construed", 782 F.2d at 158, a suggestion explicitly adopted in *In re Peterson Distributing, Inc.,* 82 F.3d at 959–60.

10. "The court finds that Midwest elected to continue its participation under the contracts and in so doing it assumed the burdens of contractual provisions regarding overpayments." *Id.* at 265.

remainder ($46,000) became available as payment postpetition. Conoco argued that Peterson's product purchases and the parties' credit card agreement constituted a single transaction justifying the application of the recoupment doctrine, relying heavily on *B & L Oil.* The court ruled that the arrangements between the parties did not constitute a "single transaction", nor were they an executory contract, and that allowing the recoupment would effectively give Conoco a security interest in the $46,000 to the obvious detriment of the estate and the unjust enrichment of Conoco. 82 F.3d at 959–63. The court also quickly dismissed Conoco's claim to set off any more than the $23,000.

Although the foregoing cases on recoupment, together with the following cases focusing on setoff (*In re Davidovich*, 901 F.2d 1533, and *Zions First National Bank, N.A. v. Christiansen Brothers, Inc. (In re Davidson Lumber Sales, Inc.)*, 66 F.3d 1560 (10th Cir.1995)) are somewhat contradictory, their collective broad outline provides a reliable enough standard for a decision.

■ To begin with, although there is no provision for it in the Code, courts apply recoupment in bankruptcy cases. *E.g., B & L Oil; In re Yonkers Hamilton Sanitarium Inc.,* 22 B.R. 427, 432–35 (Bankr. S.D.N.Y.1982) (applying recoupment doctrine as not governed by §§ 553 and 362); *Anes v. Dehart (In re Anes),* 195 F.3d 177, 182 (3rd Cir.1999).

■ To employ recoupment, the parties' claims must arise out of the "same transaction". It is not enough merely that the claims arise out of the same contract; something more is required. *Peterson*

*Distributing,* 82 F.3d at 960–61, citing *B & L Oil,* 782 F.2d at 157–58. *But see B & L Oil,* 782 F.2d at 158–59 (claims need not arise out of same transaction to justify recoupment-like relief).

■ In the instant case, Furrs and FMG continually dealt with each other, buying and selling goods respectively. FMG has filed affidavits from Mr. Scott (doc 43) and Messrs Eder, Bullock and Lipovich describing the "oral agreement" for the purchase of goods from FMG by Furrs. Exhibits G, H and I in support of FMG's opposition to the Trustee's summary judgment motion and FMG's motion for summary judgment (docs 40 and 42). All those affidavits focus strongly on the payment terms allegedly agreed to by the parties but provide no evidence of the "same transaction" needed to support a recoupment claim. In other words, even accepting at face value the factual assertions of the affidavits, they prove little more than there was an agreement which the parties adhered to when they dealt with each other.[11] All of these sales and purchases were essentially independent transactions; either party was free to cease buying from or selling to the other at any time and neither party would have (or at any rate should have) felt there had been any breach of contractual obligations.

At the same time, *B & L Oil* suggests or states that the claims need not arise out of the same transaction for the creditor to get the benefit of a recoupment-type of ruling. *B & L Oil,* 782 F.2d at 158–59. *Contra Peterson Distributing,* 82 F.3d at 960–61. However, in *B & L Oil,* the Tenth Circuit emphasized the executory contract nature of the division order out of which all the transactions had arisen, which justi-

---

11. The Trustee disputes (*see generally* Dunlap affidavit, attached to Trustee's Response (doc. 45)) what if any agreement existed between the parties; therefore, to the extent it turns out to be relevant (as it may be for purposes of the ordinary course of business defense, § 547(c)(2)), this is treated as a disputed issue of fact.

fied granting "recoupment-style" relief. And *Peterson Distributing*, 82 F.3d 956, the Circuit's most recent statement on the subject of recoupment, emphasizes that recoupment "is only applicable to claims that are so closely intertwined that allowing the debtor to escape its obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all unsecured creditors share equally in the debtor's estate." *Id.* at 960. In the instant case, nothing tied one transaction to the next or to the one before it in such a way that it would have been unfair to one party or the other to permit one transaction and not require another. Nothing like the equivalent of a division order or dissolution agreement connected the two parties and generated the transactions.

■ Another important principle is that the doctrines of recoupment and setoff should not be used, or at least used only sparingly, in derogation of the fundamental tenets of the Bankruptcy Code. *E.g.*, *In re Peterson Distributing*, 82 F.3d at 959–60. Of course, disregarding at least one fundamental tenet of the Bankruptcy Code (the cleavage in time) is precisely what *B & L Oil* permitted, to the detriment of the estate. 782 F.2d at 159. However, the Tenth Circuit's emphasis on the division order being in the nature of an executory contract allowed the court to

bridge that cleavage, since the assumption of an executory contract essentially converts prepetition debt into postpetition administrative expense. § 365(g). The Tenth Circuit also found that the circumstances of *B & L Oil* presented a classic case of unjust enrichment. *Id.* In addition to the fact that in the instant case there was no overarching agreement or contract that united the series of sales (much less an assumption of any such contract), there were also no circumstances which constituted what would ordinarily pass for unjust enrichment. Thus there is no reason to override those deep distinctions inherent in the Code.[12]

## SETOFF

■ Section 553(a) provides that, with certain exceptions not applicable here, the Bankruptcy Code does not affect the right of a creditor holding a prepetition claim against the estate from setting off that claim against a prepetition debt it owes to the estate.[13] Nevertheless, "[s]etoff in bankruptcy is neither automatic nor mandatory; rather, its application rests within the sound discretion of the bankruptcy court. 5 *Collier on Bankruptcy* ¶ 553.02[3] (15th ed. rev.2003)." *United States v. Myers (In re Myers)*, 362 F.3d 667, 672 (10th Cir.2004) (concerning prepetition

12. This decision is not contrary to *In re Communication Dynamics, Inc.*, 300 B.R. 220 (Bankr.Del.2003), holding that when the debtor's secured lender had given notice of the lender's security interest in accounts receivable to the creditor who had purchased equipment from the debtor, the doctrine of recoupment would allow the creditor to net out the account payable against the creditor's claim against the debtor, whereas if setoff had been applicable, the creditor would have had to pay the account payable to the lender. *Communication Dynamics* was essentially a dispute between two creditors and did not involve any fundamental bankruptcy policy.

13. "Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995). The facts of that case make it clear that the Supreme Court was speaking of the offset of prepetition claims. For example, the court cited the part of § 542(b) which excuses payment to the estate of any obligation which may be offset under § 553. *Id.* Section 553(a) limits the right of offset to prepetition debts.

claims). There is no provision in the Code which addresses postpetition setoffs. *In re Davidson Lumber Sales, Inc.*, 66 F.3d at 1569. In the instant case, because permitting the setoff (or, for that matter, recoupment) would probably permit FMG to collect a greater amount of its claim than other administrative claimants, the setoff cannot be allowed.

The concept and right of setoff has been acknowledged for centuries. *E.g., Gratiot v. United States*, 40 U.S. 336, 370, 15 Pet. 336, 10 L.Ed. 759 (1841) ("It is but the exercise of the common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him."); *see generally* McCoid, Setoff: Why Bankruptcy Priority?, 75 Va. L.Rev. 15, 19 (1989) ("Setoff in English bankruptcy practice dates at least to the late seventeenth century."). All the nineteenth century bankruptcy acts permitted offset of prepetition claims, *Carr v. Hamilton*, 129 U.S. 252, 256, 9 S.Ct. 295, 32 L.Ed. 669 (1889); *New York County National Bank v. Massey*, 192 U.S. 138, 146, 24 S.Ct. 199, 48 L.Ed. 380 (1904). Although the earlier cases, relying on an English case decided by Lord Mansfield[14], attributed the right of setoff to "natural justice and equity", *e.g., Carr v. Hamilton*, 129 U.S. at 255–56, 9 S.Ct. 295, later courts simply recognized the overwhelming prevalence of setoff in the commercial world, *e.g., Studley v. Boylston National Bank of Boston*, 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913) and characterized setoff as "grounded on the absurdity of making A pay B when B owed A." *Id.*, cited in *Citizens Bank of Maryland v. Strumpf*, 516 U.S. at 18, 116 S.Ct. 286.[15] And these cases, English and American, occurred in a bankruptcy context. So, for example, it was obvious to the court in *New York County National Bank v. Massey*, 192 U.S. at 146–47, 24 S.Ct. 199, that if prepetition debts could be setoff postpetition by statute, a setoff that occurred prepetition could not constitute a preference in violation of section 68a of the Act. *See also Scott v. Armstrong*, 146 U.S. 499, 510–511, 13 S.Ct. 148, 36 L.Ed. 1059 (1892) ("The equity of equality among creditors is either found inapplicable to such set-offs or yields to their superior equity," in the context of an insolvent bank.).[16]

14. *Carr v. Hamilton*, 129 U.S. at 255, 9 S.Ct. 295, relies on 2 Story, Equity Jur. § 1433, which in turn cites *Green v. Farmer*, 4 Burr. 2214, 1 Wm Bl. 651, 98 E.R. 154 (1768).

15. The early English statutes permitting setoff in bankruptcy cases were apparently necessitated by the courts of law insisting that two opposing lawsuits be filed to resolve such disputes, *Carr v. Hamilton*, 129 U.S. at 256, 9 S.Ct. 295. *Compare Studley v. Boylston National Bank of Boston*, 229 U.S. at 528, 33 S.Ct. 806 ("[T]he defendant, to avoid a circuity of action, may interpose his mutual claim by way of defense, and if it exceeds that of the plaintiff, may recover for the difference.").

16. Section 68a of the bankruptcy act of 1898 provides that "in all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." The object of this provision is to permit, as its terms declare, the statement of the account between the bankrupt and the creditor, with a view to the application of the doctrine of set-off between mutual debts and credits. The provision is permissive rather than mandatory, and does not enlarge the doctrine of set-off, and cannot be invoked in cases where the general principles of set-off would not justify it. *Black*, Bankr.544; *In re Kyte*, 182 F. 166 (M.D.Pa.1910). The matter is placed within the control of the bankruptcy court, which exercises its discretion in these cases upon the general principles of equity. *Hitchcock v. Rollo*, 3 Biss. 276, F.Cas. No. 6,535, 12 F.Cas. 231. The section was taken almost literally from § 20 of the act of 1867 [14 Stat. at L. 526, chap. 176]. In *Sawyer v. Hoag*, 17 Wall. 610, 21 L.Ed. 731, in considering that section of the act of 1867, this court

The problem with all these analyses, other than the ones based strictly on what the statute allowed, is that the "ability to set off has the same effect as an unrecaptured preference and is as valuable to a creditor as a security interest in part of the debtor's estate.... [I]t is at odds with the principle of creditor equality." *McCoid*, 75 Va. L.Rev. at 18. For a bankruptcy court, the issue of the setoff of prepetition claims is resolved by statute; section 553(a) permits setoffs and no further inquiry in required. "We are to interpret statutes, not to make them." *New York County National Bank v. Massey*, 192 U.S. at 147, 24 S.Ct. 199. But there is no statute that addresses the setoff of postpetition claims.

The Tenth Circuit has issued two decisions which deal explicitly with the setoff of postpetition claims.[17] In *In re Davidovich*, 901 F.2d 1533, Davidovich and Welton dissolved their law partnership and agreed to a formula for dividing the partnership assets. The parties then arbitrated their disputes under the formula, and the arbitration committee ruled that each party owed the other certain sums under the dissolution agreement. Before the arbitration was complete, Davidovich filed a chapter 7 petition. The Tenth Circuit ruled that the postpetition arbitration award dealt with the parties' prepetition claims against each other, and therefore Welton could reduce the estate's claim against him either by setoff (§ 553) or by recoupment.

Setoff under section 553 is permitted because both claims arose before Davidovich filed for bankruptcy, are between the same parties acting in the same capacity and are otherwise valid and enforceable.... An offset [netting out] is similarly available under the doctrine of recoupment because both debts arise out of a single integrated transaction, the binding arbitration proceeding before the Committee, such that it would be inequitable for Davidovich to enjoy the benefits of that transaction without meeting its [sic] obligations [citing *B & L Oil Co.*].

*Id.* at 1537–38. (Other citations omitted.) *Contra, Sechuan City, Inc. v. North American Motor Inns, Inc. (In re Sechuan City, Inc.)*, 96 B.R. 37, 44–45 (Bankr.E.D.Pa. 1989) (damages for violation of automatic stay could not be set off by administrative rent claim).

On the other hand, the Tenth Circuit did not permit the netting out, by offset or recoupment, of a claim against the estate for a separate real estate partnership obligation that Welton (and others) had advanced for Davidovich, partly because the alleged claim arose after the filing of the petition. 901 F.2d at 1538. *See also New York City Shoes, Inc. v. McCarthy*, 115 B.R. 64, 65–66 (E.D.Pa.1990) (failure to timely file an administrative claim for rent precluded assertion of postpetition rent claim as a preference defense).

said: "This section was not intended to enlarge the doctrine of set-off or to enable a party to make a set-off in cases where the principles of legal or equitable set-off did not previously authorize it." While the operation of this privilege of set-off has the effect to pay one creditor more than another, it is a provision based upon the generally recognized right of mutual debtors, which has been enacted as part of the bankruptcy act, and when relied upon should be enforced by the court.

*New York County Nat. Bank v. Massey*, 192 U.S. 138, 24 Sup.Ct. 199, 48 L.Ed. 380.

*Cumberland Glass Mfg. Co. v. De Witt*, 237 U.S. 447, 454–55, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915).

17. The Tenth Circuit dismissed a third case that would have dealt with setoff of postpetition claims on jurisdictional grounds. *Farmers Home Administration v. Buckner (In re Buckner)*, 66 F.3d 263, 265 (10th Cir.1995).

In *In re Davidson Lumber Sales, Inc.,* 66 F.3d 1560, the bank had obtained a lien on the postpetition accounts receivable of the chapter 11 estate. Christiansen, a general contractor, bought materials postpetition on credit from Davidson. Davidson obtained the materials from two of its suppliers but, in a return to prepetition form, did not pay the suppliers for the materials. One of the suppliers filed a lien against the project, and Christiansen, having contracted with the owner of the project to deliver the project free of liens, paid the supplier directly. The bank sued the general contractor for the amount of the account receivable.

Interpreting Utah law, the Tenth Circuit utilized setoff to uphold a judgment for the general contractor, ruling that the right of setoff trumped the bank's security interest. 66 F.3d at 1565–66. The court also ruled that the direct payment to the supplier did not violate the several Bankruptcy Code sections cited by the bank. The court explained that the case law (and legislatures) had over time established an independent obligation in circumstances like these from the general contractor to the supplier, justifying the direct payment from Christiansen to the supplier that never became property of the estate and bypassed Davidson and the bank. *Id.* at 1566–69. The court went on to explain that denying setoff in these circumstances would not benefit the estate, but only provide a "windfall" to the secured creditor. *Id.* at 1569–70. And the court faulted the

bank for failing to protect its postpetition lien on the accounts receivable by giving notice under the Uniform Commercial Code. *Id.* at 1570–71.

■ As for postpetition setoff, *Davidson Lumber* clearly allows such a thing even in the absence of an explicit or implicit Code provision. 66 F.3d at 1569.[18] But the court made clear in *Davidson Lumber* that the payment in question would not have been used for the estate's reorganization. *Id.* at 1570. Rather, the payment would have passed directly through the estate to the bank, and it would have constituted a windfall to the bank.[19] *Id.* at 1568 and n. 10. In the instant case, the payment will go the estate. And although Furrs is no longer "reorganizing" as was the case in *Davidson Lumber, see id.* at 1569–1570, and in *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 471, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974) (railroad reorganization under § 77 of the Bankruptcy Act, 11 U.S.C. § 205 (49 Stat. 911 (Aug. 27, 1935))), it still has a considerable stake in complying with the Code and its priorities, specifically in ensuring prorated payments of chapter 11 administrative claims. In consequence, these are not the "appropriate circumstances" for a postpetition setoff, 66 F.3d at 1569, which might well give FMG a greater percentage distribution on its administrative claim.

Because *Davidovich,* 901 F.2d 1533, deals only with the setoff of prepetition

---

18. FMG states without supporting argument or authority that its Account Balance constitutes a lien against the estate pursuant to § 506. Cross motion for summary judgment at 25 n. 1. However, § 506(a) explicitly refers to § 553, which deals only with the effect of the setoff of prepetition claims, and thus is not applicable to FMG's arguments for postpetition setoff. The procedure and authority for obtaining a lien against estate assets postpetition is set out in § 364.

19. This analysis by the court is also questionable. Given that the postpetition receivables of the estate were the consideration received by the bank for a postpetition loan to the estate, it is hard to see why receipt of the payment would be a windfall to the bank, unless the court's use of that term was a further chastisement of the bank for its failure to protect itself by a UCC notice. *See In re Davidson Lumber Sales, Inc.,* 66 F.3d at 1570–71.

claims and with recoupment (which the Court has already found to be inapplicable *supra*), it provides no support for FMG's position. Even if it is conceded that post-petition setoff rights are preserved in the Code, as FMG argues in its cross motion for summary judgment, at 23–24, determining what property rights the parties have (which may well be determined by state law, *Butner v. United States*, 440 U.S. 48, 54 n. 9, 99 S.Ct. 914, 918 n. 9, 59 L.Ed.2d 136 (1979)) is a different inquiry than the distinctly "federal" question of ensuring the smooth administration of the estate.[20]

Further, what FMG seeks to do is to reduce the funds available for payment of chapter 11 expenses by in effect asserting it holds a secured claim on a portion of the estate's postpetition collections. It may not get paid more than other creditors of the same class by elevating itself into the position of a holder of a secured claim by asserting setoff, *In re Myers*, 362 F.3d at 672 n. 5 (citing *Farmers Home Administration v. Buckner (In re Buckner)*, 66 F.3d 263, 265 n. 3 (10th Cir.1995)), or recoupment, *Peterson Distributing*, 82 F.3d at 960, at least where there likely will not be enough to pay all those administrative claims in full.

■■■ A common thread in many of the recoupment and setoff cases is the courts' desire for "equity" or "fairness". "The right of setoff is one which is grounded in fairness. It would be un-fair to deny a creditor the right to recover an established obligation while requiring the creditor to fully satisfy a debt to a debtor. Hence, the right of setoff is universally recognized. 4 *Collier on Bankruptcy* 15th Ed. ¶ 553.02 (1986)."

*Turner v. United States (In re G.S. Omni Corporation)*, 835 F.2d 1317, 1318 (10th Cir.1987), *cited in In re Davidovich*, 901 F.2d at 1539. *See also In re G.S. Omni Corp.*, 835 F.2d at 1318; *Peterson Distributing*, 82 F.3d at 960 ("the 'same transaction' analysis [for recoupment] involved an examination of the parties' equities"). But what is "equitable" or "fair" to the creditor must be measured against the language of the statute and the policies embodied therein, including the policies of equal distribution to creditors and payment of administration expenses. Sections 506(a) and 553(a) explicitly permit prepetition offsets even though such offsets run counter to the Code's overall goal of equal distribution. But recoupment as a non-statutory exception to the statute should be narrowly construed. *Id.* at 960–61. And there is no reason not to apply the same standard to postpetition setoffs.[21]

To be clear, FMG is entitled to its administrative claim and to distribution thereon. But the orderly way to address that problem is to have FMG return the preferences and the Account Balance to the estate and then receive back its (admittedly pro rata) share of the distribution

---

20. FMG quotes *In re Davidson Lumber Sales, Inc.*, 66 F.3d at 1569, for the proposition that courts generally allow setoff of postpetition debts even though the Code does not address that situation. Other than this, neither party has explicitly argued the issue of whether the doctrines of recoupment or postpetition setoff are contrary to, or an unwarranted addition to, the Code, an issue not addressed in *Davidson Lumber Sales*. For that reason, and in light of the disposition of these motions, the Court does not address that issue, but rather assumes that both are permissible.

21. "Generally, a right to setoff is not affected by bankruptcy." *Farmers Home Administration v. Buckner (In re Buckner)*, 218 B.R. 137, 145 (10th Cir. BAP 1998), *app. dismissed* 66 F.3d 263 (10th Cir.1995). This case dealt with the offset of prepetition claims, and therefore was covered by the explicit provisions of the statute.

on its administrative claim. Although § 502(d) does not mandate this result, *Beasley Forest Products, Inc. v. Durango Georgia Paper Company (In re Durango Georgia Paper Company)*, 297 B.R. 326 (Bankr.S.D.Ga.2003) (analyzing and resolving the opposing rulings on this subject), the same result is nevertheless dictated by the fact that this case is likely administratively insolvent and by the important bankruptcy policies of equal distribution to creditors and of paying administrative expenses as fully or at least as equally as possible. The result also complies with the policy of narrowly applying the doctrines of setoff and recoupment in derogation of fundamental bankruptcy policies. Thus, even if it were the case that the postpetition purchases and sales between the parties constituted a "single transaction" for purposes of the recoupment doctrine, FMG would not be allowed to net out the Account Balance against the reclamation claim.

Were setoff truly a matter of equity and fairness, there might be more reason to allow it to override the policies of the bankruptcy Code. But since those words—equity and fairness—are little more than remnants of outmoded judicial doctrines or pleading (or forum) requirements ritually repeated by various courts, there is no reason to apply the doctrine to the detriment of bankruptcy policies.